COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| KEITH COPELAND AND EUGENE SAUNDERS, | § | No. 08-20-00236-CV |
| | § | Appeal from the |
| Appellants, | | |
| | § | County Court at Law No. 1 |
| v. | | |
| | § | of Travis County, Texas |
| JUSTIN MAYERS, | | |
| | § | (TC# C-1-CV-20-002978) |
| Appellee. | | |
| | § | |

**O P I N I O N**

This interlocutory appeal follows the trial court's denial of two non-resident defendants' special appearances.[1] Justin Mayers, sued Keith Copeland, Eugene Sanders, and Skip Ames, (Defendants), alleging they failed to pay him money owed on a sports bet.[2] Copeland and Saunders (Appellants) each filed a special appearance contending they lack sufficient contacts with Texas to justify the court's exercise of jurisdiction over them. Because we find Appellants meet the

---

[1] This case was transferred from our sister court in Travis County, Texas pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001. We follow the precedent of the Austin Court of Appeals to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

[2] Skip Ames has not appeared in the lawsuit and is not a party to this appeal.

statutory and due-process requirements of specific jurisdiction, we affirm the trial court's denial of their special appearance.

## *Factual Background*

Mayers sued Defendants for money had and received, promissory estoppel, and unjust enrichment. Mayers' claims arise from Defendants' purported refusal to pay him what he is owed from placing sports bets with Defendants. Specifically, Mayers claims about February 23, 2020, he "placed a wager that should have paid out $75,000" but despite "demand[ing] payment multiple times in writing, including through counsel before suit was filed," Appellants "refused to pay what is owed or even offer restitution for the amount [he] deposited."

Mayers alleges his relationship with Appellants began when Copeland "reached out" to him in late Spring 2018 "to discuss placing sporting bets" after Copeland received Mayers' contact information from mutual acquaintance Mike Muniz. Appellee states after being introduced to Copeland, he "learned that Mr. Copeland was a business partner with Defendants Skip Ames and Eugene Saunders" and that "[t]ogether the Defendants run the sports betting website www.sunwager.com which is owned by Ames." Appellee further says he "routinely logged into Defendants' website from his Austin home and entered into agreements with Defendants on sporting events." Mayers contends that "[t]hroughout their relationship, Ames and Saunders routinely sent funds to [his] Austin home and [he] routinely sent funds to Ames and Saunders," pointing to appended copies of text messages between the parties that show as much. Further, he alleges "[t]he parties exchanged hundreds of thousands of dollars as directed by Copeland, who was [his] primary point of contact from Spring 2018 through March 2020 when Defendants stopped responding to [Mayer'] request for payment."

2

Copeland and Saunders see things slightly differently. Copeland alleges he "first became acquainted with Mr. Mayers through Mike Muniz, a personal friend," and "[t]he first time [he] recall[s] speaking with Mr. Mayers was while Mr. Mayers was with Mr. Muniz and both called [him] at [his] home in Colorado." Copeland claims he "did not ask Mr. Muniz to put [him] in contact with Mr. Mayers" and Mr. Muniz did not do so "on [his] behalf or at [his] direction." He further alleges that he and Mayers "spoke by telephone or communicated via text message while [he] was in Colorado" but that he "did not inquire and do[es] not know where Mr. Mayers was located during the majority of these communications." As to the text messages Mayers appends to his pleadings, Copeland states he drafted and sent "[s]ome of the texts appearing on the log;" however, there are other text messages he "did not draft, but instead, copied from other texts [he] had received and sent to Mr. Mayers." Copeland further alleges he is not now nor has he ever "been a business partner with Skip Ames or Eugene Saunders," and he does not currently nor has he ever "had any ownership interest in the website www.sunwager.com." He also contends he has "never personally met with Mr. Mayers in Texas or anywhere else;" is "not a party to any oral or written contract with Mr. Mayers;" "never requested Mr. Mayers to send any money to [him] nor ha[s he] ever received or accepted any funds from Mr. Mayers;" has "never entered into any agreement with Mr. Mayers to pay him money;" and has "never travelled to Texas in connection with any transaction concerning Mr. Mayers."

For his part, Saunders alleges he "(a) does not own, (b) is not employed by, (c) never contracted with, (d) never made wagers with, and (e) has no financial connection to www.sunwager.com." He states he "is a nonresident of Texas" with "no purposeful contacts with this state." He also claims he "is not business partners with Defendants Ames and Copeland" and

3

"has no business or personal relationship with" Copeland.[3] Saunders states that he and Ames "are long-time friends," and Ames "on occasion visits with [him] at [his] business office in Miami, Florida." He further contends he "has a FedEx business account" which "offers [him] the convenience of printing shipping labels at his office" and entitles him "to discounts on shipments from his FedEx account." Because of that, Saunders alleges, "[e]very once in a while, during a visit to the Miami office, Defendant Ames will use [his] business FedEx account to send FedEx shipments from Miami, Florida," which he characterizes as "not an unusual or abnormal activity for [him] and his friends, customers and business acquaintances." In sum, Saunders claims he "is in this suit because of his FedEx business account, not because of contacts with Texas or www.sunwager.com."

### *Procedural Background*

After Mayers filed suit in County Court at Law No. 1 in Travis County for damages he alleges arise from the above transactions, Saunders and Copeland responded by each filing a special appearance contesting the trial court's ability to exercise personal jurisdiction over them.

Mayers then twice amended his petition and filed an omnibus response to Saunders' and Copeland's respective special appearances. Mayers' second amended petition (the live pleading in the case) appended a personal affidavit detailing his allegations of the events described above and copies of text messages between Mayers and each of the individual Defendants.

Saunders and Copeland each filed amended special appearances and exhibits, including respective affidavits setting forth their own allegations of the transactions at issue. Saunders also raised objections to Mayers' affidavit on the grounds that Mayers' testimony is not based on

---

[3] In paragraph 5 of his first amended special appearance Saunders actually states he "has no business or personal relationship with Defendant Skip Ames;" however, this appears to be a typo given the context that follows—*i.e.*, a description of Saunders and Ames' "long-time friend[ship]."

4

personal knowledge, contains hearsay, contains factual conclusions, and, as such, is not competent evidence.

The trial court considered Saunders' and Copeland's special appearances by submission and denied them both. Saunders and Copeland responded by requesting the trial court issue findings of fact and conclusions of law pursuant to Texas Rule of Civil Procedure 297.

The trial court issued its findings of fact and conclusions of law, in which it overruled Saunders' objections to Mayers' affidavit in determining it could exercise personal jurisdiction over Saunders and Copeland. Specifically, the trial court made the four following findings of fact:

1. For a period of nearly two years, Defendants Keith Copeland, Eugene Saunders, and Skip Ames were party to a series of transactions with Plaintiff and Austin resident Justin Mayers and the exchange of funds.

2. Defendant Copeland initially contacted Plaintiff.

3. Plaintiff talked and texted with Copeland, Ames, and Saunders extensively to provide proof of deliveries and enter into numerous monetary transactions. Defendants regularly communicated with Plaintiff and exchanged funds with Plaintiff, an arrangement that inured to Defendants' financial benefit. All transactions either originated or were completed in Austin, Texas.

4. All Defendants knew that Plaintiff resided in Austin, Texas. Defendant Ames even met Plaintiff in person on or around December 23, 2019. Copeland also had Plaintiff send funds to Houston, Texas on or around December 9, 2019.

The trial court also made the seven following conclusions of law:

5. The Texas long-arm statute, Tex. Civ. Prac. Rem. Code § 17.042, authorizes this Court to exercise jurisdiction over non-residents Eugene Saunders and Keith Copeland for doing business in this state; and the exercise of such jurisdiction is consistent with federal and state due process standards. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007).

6. Plaintiff met his initial burden to plead facts necessary to establish that the Court has specific jurisdiction over Defendants Saunders and Copeland. *See American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002).

7. The interactions, agreements, and communications between Plaintiff and Defendants as detailed in the Court's Findings of Fact demonstrate Defendants

5

created a continuous relationship and obligations with Plaintiff in the State of Texas and purposefully availed themselves of the privilege of conducting activities in this state. *See Wilson v. Baker*, No. 03-10-00507-CV, [2011 WL 6938523,] at *9 (Tex.App.—Austin, Dec. 29, 2011).

8. The agreement for Plaintiff to exchange funds with Saunders and Ames, usually at the direction of Copeland, was to be performed in whole or in part in this state.

9. Defendants' interactions with Plaintiff could also serve as a basis for a tort committed in whole or in part in this state.

10. Through these various interactions, agreements, and communications, Defendants established 'minimum contacts' with Texas giving rise to Plaintiff's claims; and the assertion of jurisdiction in this state complies with 'traditional notions of fair play and substantial justice.' *See Moki Mac* at 575 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

11. Defendants Saunders and Copeland have not negated all potential bases for jurisdiction that Plaintiff has specifically pled and evidenced. *See American Type* at 807.

Saunders and Copeland both appealed.

### *Standard of Review*

We review challenges to trial courts' granting of special appearances *de novo*. *Fed. Corp., Inc. v. Truhlar*, 632 S.W.3d 697, 716 (Tex.App.—El Paso 2021, pet. denied). "Whether a court has personal jurisdiction over a defendant is a question of law." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). However, a trial court considering a jurisdictional challenge "frequently must resolve questions of fact before deciding the jurisdiction question." *Id.*

When, as here, the trial court issues findings of fact and conclusions of law, an appellant may challenge the findings of fact on legal and factual sufficiency grounds. *Fed. Corp.*, 632 S.W.3d at 716. If an appellant advances a factual sufficiency challenge, we examine the entire record and consider the evidence in favor of, and contrary to, the challenged finding; however, we may set aside a finding only if that finding is so contrary to the overwhelming weight of the

6

evidence as to be clearly wrong or unjust. *Id.* (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). If an appellant advances a legal sufficiency challenge, the record must contain more than a scintilla of evidence to support the questioned finding; if it does, the no-evidence point fails. *Id.* at 716–17 (citing *BMC Software*, 83 S.W.3d at 795).

### *Applicable Law*

"A court must have both subject matter jurisdiction over a case and personal jurisdiction over the parties to issue a binding judgment." *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7–8 (Tex. 2021). A Texas court may exercise personal jurisdiction over a nonresident "when two criteria are satisfied: (1) the Texas long arm statute must grant jurisdiction; and (2) the exercise of jurisdiction must comport with federal and state constitutional guarantees of due process." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016)[Citations omitted].

"The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute." *BMC Software*, 83 S.W.3d at 793. This notice-pleading requirement is "minimal" and "can be satisfied with an allegation that the nonresident defendant is doing business in Texas or committed tortious acts in Texas." *Gaddy v. Fenenbock*, No. 08-22-00041-CV, 2022 WL 2965964, at *7 (Tex.App.—El Paso July 27, 2022, no pet. h.)[Citation omitted]. Once the plaintiff meets this initial burden, the burden shifts to the nonresident defendant to negate all jurisdictional bases alleged by the plaintiff. *Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). "The defendant can negate jurisdiction on either a factual or legal basis." *Id.* at 659. On a factual basis, "the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id.* On a legal basis,

7

> [T]he defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.* The Texas long-arm statute authorizes the exercise of jurisdiction over a nonresident defendant doing business in Texas. TEX.CIV.PRAC.&REM.CODE ANN. § 17.041–.045. A nonresident "does business in this state if the nonresident . . . contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state . . . [or] commits a tort in whole or in part in this state[.]" *Id.* § 17.042. The statute's "broad doing-business language allows [it] to reach as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575 [Internal quotation marks omitted].

The exercise of jurisdiction meets federal due-process standards "only if the defendant has established 'minimum contacts' with the forum state such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Luciano*, 625 S.W.3d at 8 (quoting *Int'l Shoe*, 326 U.S. at 316). "Courts analyze whether the due-process standard is met from two perspectives: general jurisdiction and specific jurisdiction." *Southwire Co., LLC v. Sparks*, No. 02-21-00126-CV, 2021 WL 5368692, at *4 (Tex.App.—Fort Worth Nov. 18, 2021, no pet.)(citing *Luciano*, 625 S.W.3d at 8). "A court has general jurisdiction over a nonresident defendant whose 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'" *Luciano*, 625 S.W.3d at 8 (quoting *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016)). "By contrast, specific jurisdiction 'covers defendants less intimately connected with a State, but only as to a narrower class of claims.'" *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, — U.S. —, 141 S.Ct. 1017, 1024 (2021)). "Specific jurisdiction is not as exacting as general jurisdiction in that the contacts may be more sporadic or isolated so long as the cause

8

of action arises out of those contacts." *Gaddy*, 2022 WL 2965964, at *6 (citing *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010)). With specific jurisdiction, a minimum-contacts showing requires two things: (1) that "the defendant purposefully avails itself of the privilege of conducting activities in the forum state[;]" and (2) "the suit 'arise[s] out of or relate[s] to the defendant's contacts with the forum[.]'" *Luciano*, 625 S.W.3d at 8–9.

The first prong of the specific-jurisdiction inquiry is purposeful availment. *Id*. To determine whether a nonresident defendant has purposefully availed himself of the privilege of conducting activities in Texas, courts consider three factors. *E.g.*, *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 559 (Tex. 2018). "First, it is only the defendant's contacts with the forum that count: purposeful availment 'ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third person.'" *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)(quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Second, "the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated." *Moki Mac*, 221 S.W.3d at 575. Nonresident defendants "who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities." *Michiana*, 168 S.W.3d at 785 (quoting *Burger King*, 471 U.S. at 473). Third, "the defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Moki Mac*, 221 S.W.3d at 575. That is because "[j]urisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Michiana*, 168 S.W.3d at 785 (citing *World—Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). "By contrast, a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its

9

jurisdiction." *Id.* (citing *Burger King*, 471 U.S. at 473). "In conducting this analysis, we assess 'the quality and nature of the contacts, not the quantity.'" *TV Azteca*, 490 S.W.3d at 38 (quoting *Moncrief Oil Intern. Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013)).

The second prong of the specific-jurisdiction inquiry is relatedness. Even if courts find purposeful availment, specific jurisdiction exists only "when the cause of action arises from or is related to purposeful activities in the state." *Moncrief Oil*, 414 S.W.3d at 150. For that reason, courts analyze a nonresident defendant's "jurisdictional contacts on a claim-by-claim basis" unless "all claims arise from the same forum contacts."[4] *Id.* at 150–51. The relatedness requirement "lies at the heart of specific jurisdiction by defining the required nexus between the nonresident defendant, the litigation, and the forum." *Moki Mac*, 221 S.W.3d at 579.

### *Analysis*

Saunders and Copeland raise different issues on appeal but both generally contend the trial court improperly denied their special appearance because they lack sufficient contacts with Texas to support specific jurisdiction in this case. Copeland argues the trial court erred in denying his special appearance because: (1) Mayers' jurisdictional allegations are not sufficient to confer jurisdiction over him; (2) the communications between Mayers and Copeland cannot support a purposeful-availment finding after *Michiana* and *Old Republic*; (3) Mayers' allegations of Copeland's contacts with Texas cannot support jurisdiction because Copeland did not perform those activities in Texas; (4) Mayers improperly relies on the actions of third parties; and (5) the relatedness prong is not satisfied.

---

[4] Here, Mayers' three claims arise from the same set of forum contacts that we need not assess each Appellant's contacts on a claim-by-claim basis.

Saunders raises nine issues on appeal, which restated are: (1) whether the trial court erred in denying his special appearance; (2) whether the trial court erred by overruling his objections to Mayers' declaration; and (3) whether the trial court's findings of fact survive a factual sufficiency inquiry. Specifically as to the jurisdictional question, Saunders argues the trial court erred in denying his special appearance because: (1) Mayers failed to allege facts that, if true, would subject him to personal jurisdiction in Texas; (2) Saunders submitted evidence negating all potential bases for exercising jurisdiction over him; (3) Mayers' affidavit is not competent evidence that can support the exercise of jurisdiction;[5] (4) the operative facts of the litigation do not relate to his conduct; and (5) he does not have sufficient contacts with Texas to support the exercise of personal jurisdiction over him.

Because we conclude the evidence establishes Appellants purposefully availed themselves of the privileges of conducting activities in Texas, Mayers' claims arise from or relate to those contacts, and exercising jurisdiction in this case comports with due-process requirements, we agree with the trial court's conclusions of law #5, #6, #7, #8, #10, and #11.[6] Because exercising specific jurisdiction over Appellants in this case is appropriate, we do not address whether general jurisdiction applies.[7]

---

[5] *See infea* Section 2.a.

[6] The trial court's conclusion of law #9 states that "Defendants' interactions with Plaintiff could also serve as a basis for a tort committed in whole or in part in this state." However, Mayers' claims, as stated in the live pleading, sound in quasi-contract, not tort. Because the burden of proof on a special appearance begins with the plaintiff's allegations, and because Mayers has not asserted a tort claim, we do not reach the same conclusion.

[7] Indeed, there is no evidence in the record showing Mayers contends general jurisdiction exists. The shifting burden of proof in a special appearance begins with the plaintiff's allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Kelly*, 301 S.W.3d at 658. Because Mayers makes no such allegations as to general jurisdiction for either Appellant, we need not address whether general jurisdiction applies.

## 1. The pleaded bases of jurisdiction

First, we consider whether Mayers met his initial burden of pleading sufficient allegations to bring Appellants within the provisions of the long-arm statute. Mayers' live petition contains several jurisdictional allegations against Appellants. He alleges all defendants "availed themselves of the jurisdiction of [the trial] court by conducting business within the State of Texas" and claims he "entered into agreements with Defendants on sporting events." He further alleges "[a]ll three Defendants . . . continued to conduct business with him and personally enter into numerous transactions and promises to pay an individual residing in Austin, Texas." As to Copeland specifically, Mayers also alleges Copeland "had [him] send funds to a third-party in Houston, Texas[.]"

Given Texas's liberal notice-pleading standards, we conclude Mayers' petition sufficed to allege that Appellants are subject to specific jurisdiction in Texas, and we agree with the trial court's conclusion of law #6 that says as much. Indeed, Mayers' allegations track the Texas long-arm statute directly: "[A] nonresident does business in this state if the nonresident . . . contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state[.]" TEX.CIV.PRAC.&REM.CODE ANN. § 17.042; s*ee also Caviness v. High Profile Promotions, Inc.*, No. 03-17-00553-CV, 2019 WL 1496783, at \*2 (Tex.App.—Austin Apr. 5, 2019, no pet.)(oral contract provided basis for jurisdictional allegation under the Texas long-arm statute). Mayers' allegations that he "entered into agreements" and "numerous transactions" with Appellants meets this standard. Accordingly, Appellants bore the burden to negate specific jurisdiction in Texas.

12

## 2. The trial court's findings of fact and the evidence in this case

As stated above, when a trial court makes findings of fact in a special appearance, we may set aside a factual finding "only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust." *Fed. Corp.*, 632 S.W.3d at 716 (citing *Cain*, 709 S.W.2d at 176). A no-evidence challenge:

> [M]ust, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

Saunders takes issue with the trial court's findings of fact #1, #3, and #4 that: "[f]or a period of nearly two years," the defendants were "party to a series of transactions with Plaintiff and Austin resident Justin Mayers and the exchange of funds;" the defendants "regularly communicated with Plaintiff and exchanged funds with Plaintiff, an arrangement that inured to Defendants' financial benefit;" and "[a]ll Defendants knew that Plaintiff resided in Austin, Texas." Saunders states that these findings of fact came from Mayers' affidavit; however, he argues the trial court erred by overruling his objections to the affidavit. *See infra* Section 2.a. Saunders further argues Mayers describes no transaction entered into by or involving an exchange of funds between the two parties, nor does he allege Saunders benefitted from the alleged transactions. He also contends Mayers presents no evidence establishing that Saunders knew Mayers lived in Austin.

Although Saunders' assertions may conflict with the contents of Mayers' affidavit and the trial court's findings of fact, "it was the trial court's function to weigh, accept, and disregard the evidence in arriving at its factual findings." *Parex Res., Inc. v. ERG Res., LLC*, 427 S.W.3d 407, 438 (Tex.App.—Houston [14th Dist.] 2014), *aff'd sub nom. Searcy v. Parex Res., Inc.*, 496 S.W.3d

13

58 (Tex. 2016). Here, the record contains evidence that supports all four findings of fact. Specifically, Mayers' affidavit states that after he was "introduced to Defendant Keith Copeland," he "started placing bets on sunwager.com starting in the Summer of 2018." He explains that if he was owed money, "Mr. Ames or Mr. Saunders would usually FedEx cash to [his] Austin address," and if he owed money, "Mr. Copeland would direct [him] where to send money, which was usually to Mr. Ames or Mr. Saunders at their addresses in Miami, []Florida." He says Copeland "continuously communicated with [him] from the Summer of 2018 through March 2020," and Copeland told him "he made roughly $9,000 in commissions from [his] transactions with Mr. Ames and Mr. Copeland through www.sunwager.com." Mayers also appends a series of text messages between him and each defendant that provide further evidence of, among other things, the ongoing communications between the parties, the addresses exchanged for sending or receiving money related to Mayers' bets, including a package sent from Saunders to Mayers in Texas, discussions regarding amounts Mayers owed or was owed, and the amount of commission Copeland made from Mayers' betting.

Accordingly, we find that the trial court's four findings of fact are not contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. The evidence is sufficient to support a factual finding that: Copeland initially contacted Mayers; "[f]or a period of nearly two years," the defendants were "party to a series of transactions" with Mayers; the defendants "regularly communicated with Plaintiff and exchanged funds with Plaintiff, an arrangement that inured to Defendants' financial benefit;" and "[a]ll Defendants knew that Plaintiff resided in Austin, Texas."

### a. Saunders' objection to Mayers' affidavit

Saunders' objects that Mayers' affidavit is not competent evidence because it is not based

14

on Mayers' personal knowledge and there is no factual basis for Mayers' conclusions. We find that argument unavailing. "A witness may testify to a matter only if the evidence 'support[s] a finding that the witness has personal knowledge of the matter.'" *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 378 (Tex. 2019)(quoting TEX.R.EVID. 602). Personal knowledge under Texas Rule of Evidence 602 has "low threshold" and requires only a "minimal foundation of personal knowledge[,]" leaving the fact finder to assess the evidence's probative value and weight. Rules of Evid.Handbook Rule 602 (2022 ed.).

The record reflects Mayers' affidavit was based on his personal knowledge. He testifies that he has "personal knowledge of the facts and documents referenced" in his affidavit. Further, his testimony sets forth that he was personally involved in placing bets, discussing payments with Copeland, sending or receiving payments to or from Ames or Saunders, and discussing bets with the defendants. Mayers substantiates the assertions that he spoke with the defendants about bets and sending and receiving payments with copies of text messages with the defendants attached as exhibits to his affidavit.

Copeland and Saunders both vigorously dispute Mayers' assertion that the defendants were "business partners," claiming Mayers fails to disclose who he "learned" that information from and provides no substantiation for that conclusion. However, the trial court did not reference or rely on that statement in making its findings of fact, and nowhere in the findings of fact or conclusions of law does the trial court refer to the defendants as "business partners." Accordingly, even assuming that piece of Mayers' affidavit should have been stricken at the trial court level, it was harmless error. *See* TEX.R.APP.P. 44.1(a)(1)("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error

15

complained of . . . probably caused the rendition of an improper judgment[.]").

Under these circumstances, the trial court did not err in overruling Saunders' objections when resolving the fact issues necessary to decide the special appearances.

### 3. Whether exercising specific jurisdiction is proper

Having found Mayers met his initial burden to plead sufficient allegations to bring Appellants within the provisions of the long-arm statute and the factual-sufficiency challenges fail, we now turn to whether Copeland and Saunders each produced evidence to negate specific-jurisdiction minimum contacts or whether they otherwise showed that exercising jurisdiction would run afoul of due-process requirements.

#### a. Minimum contacts

##### i. Copeland purposefully established minimum contacts with Texas to support the exercise of specific jurisdiction.

Copeland contests the notion that he established minimum contacts with Texas. He states he "lives and works in Colorado" and has "absolutely no connection to Texas other than family members who reside in the state." He asserts that the extent of his contacts with Texas, if any, are limited to the allegations described in Mayers' live pleading and affidavit—namely, that after meeting in 2018, he and Mayers regularly communicated over phone calls and text messages. He further asserts that despites Mayers' allegations, he "was not a party to any of the alleged transactions giving rise to [Mayers'] claims;" he has never "been a business partner with defendants Skip Ames or Eugene Saunders;" he "does not currently and never has had any ownership interested in www.sunwager.com;" he "has never met Mayers" in person; he "has never requested Mayers to send him any money nor has he ever received or accepted any funds from Mayers;" he "has never entered into any agreement with Mayers to pay him money;" and his "interaction with Mayers took place exclusively from Colorado." Copeland states that he "did not

16

choose where his phone calls or texts would be received" because "that was Mayers' choice;" the fact that Mayers received his communications in Texas was "due to the mere fortuity of where Mayers chose to live, not anything purposeful done by [him]." He claims that "[t]he fact that Mayers happened to live in Texas and allegedly enter[] into transactions with . . . Ames" amounts to "coincidences . . . completely out of [his] control."[8]

Copeland cites *Michiana* and *Old Republic* in support of his argument that his contacts with Texas do not constitute purposeful availment. In *Michiana*, the Texas plaintiff solicited the purchase of an RV from an out-of-state seller. 168 S.W.3d at 784. The purchaser then attempted to sue the seller based on an alleged misrepresentation made in a telephone call. *Id.* The Texas Supreme Court concluded that the phone call failed to satisfy the three key requirements of purposeful availment: the Texas resident—not the out-of-state seller—initiated the sole phone call at issue; the seller's contact with Texas was isolated and fortuitous; and the seller did not avail itself of the privilege of doing business in Texas. *Id.* at 785–87.

Similarly, in *Old Republic*, the Court determined a nonresident did not purposefully avail herself of the state such that Texas courts could exercise personal jurisdiction over her, even in a case involving "hundreds of phone calls with a Texas resident[.]" 549 S.W.3d at 560. The Court reasoned that "[o]n their own, numerous telephone communications with people in Texas do not establish minimum contacts;" instead, courts considering communications between a Texas resident and nonresident as the basis for jurisdiction must "look to the quality and nature of the communications to establish purposeful availment." *Id.* (citing *Searcy*, 496 S.W.3d at 74). In *Old Republic*, the nonresident was "very close friends" with the Texas resident, and the two "spoke

---

[8] To the extent Copeland intends to raise a factual-sufficiency challenge with the trial court's findings of fact, we overrule that issue. *See supra* Section 2.a.

frequently on the phone." *Id.* at 561. But the record contained no evidence that the nonresident initiated the calls with the Texas resident. *Id.* And, while the Court concluded it was entirely plausible that the two discussed the circumstances surrounding the Texas resident's financial situation, there was no evidence supporting the notion that the two were "thinking ahead," "trying to plan," and "brainstorming" the alleged fraudulent transfer. *Id.* Accordingly, the Court rejected the notion that "phone calls with a friend who happens to live in Texas" formed sufficient contacts with Texas to confer jurisdiction. *Id.*

Relying on these two cases, Copeland contends the Court's guidance "a proper minimum-contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there" forecloses the argument that his communications with Mayers support a finding of purposeful availment. However, Copeland's actions in this case materially differ from those described in *Michiana* or *Old Republic*.

Although Copeland did not, to his point, "choose" for Mayers to live in Texas, there is evidence in the record to support the allegation that he entered a series of transactions with him in which he directed Mayers to either send money to other individuals from Texas or arranged for money to be sent to Mayers in Texas. For example, the record reflects the following interactions between Copeland and Mayers:

- February 15, 2019: Mayers asks Copeland to "ask your boy to either clear 10 or add 10 credit," to which Copeland responds "he will clear to 10[.]"

- February 18, 2019: Copeland asks Mayers, "How much are you sending? I'll get him to credit your account."

- March 8, 2019: Copeland sends Mayers an address for Mayers to send money to, to which Mayers responds with a photo of a FedEx shipping receipt reflecting Ames as the recipient.

- March 20, 2019: Copeland texts Mayers, "Call me. Skip said you owed 12000 two weeks ago and you sent 5k, then this past week you owed 6900 and you sent nothing?"

- March 22, 2019: Mayers asks Copeland if he can "ask [S]kip for 5-10k more credit," and Copeland responds, "He added 7k."

- March 25, 2019: After Mayers sends a photo of a FedEx shipping receipt reflecting Ames as the recipient, Copeland tells Mayers, "He will credit your account 1584$ when he gets your package."

- April 2, 2019: Copeland tells Mayers to "Take out 10%, and send the rest."

- April 23, 2019: Copeland tells Mayers, "Send me your address[.]"

- April 24, 2019: Copeland sends Mayers a photo of a package addressed to Mayers' address.

- May 7, 2019: Copeland sends Mayers a photo of a package addressed to Mayers' address.

- May 15, 2019: Copeland sends Mayers a photo of a package addressed to Mayers' address.

- July 23, 2019: Copeland sends Mayers a photo of a package addressed to Mayers' address.

- September 24, 2019: Copeland asks Mayers, "Do you want [S]kip to send the full amount? He said you've already put in a bunch of plays, and wouldn't have much credit left. Let me know."

- September 25, 2019: Copeland sends Mayers a photo of a package addressed to Mayers' address.

- October 30, 2019: Copeland sends Mayers a photo of a package addressed to Mayers' address.

- November 22, 2019: Copeland tells Mayers, "Send me tracking once you have it." Mayers responds with a photo of a FedEx shipping label reflecting Ames as the recipient.

- November 28, 2019: Copeland sends Mayers a message reading, "I'm in Texas but I know it was delivered. He was down 12k at the end of previous week. Did he send 99 or did he send more? I will credit, just let me

know[.]"[9] Mayers responds that he "sent 9k" and "I can PayPal whatever it is[.]"

- December 9, 2019: Copeland sends Mayers a message reading, "Please FedEx inside magazine." and including a Houston address to which he instructs Mayers to "[s]end package here."[10]

- December 11, 2019: Copeland asks Mayers, "Did you send package?"[11] Mayers responds with a photo of a FedEx shipping receipt reflecting Flagstone Mortgage in Houston, Texas, as the recipient.

- Mayers' affidavit stating that: (1) he was introduced to Copeland through a mutual friend; (2) he learned Copeland was "business partners" with Saunders and Ames; (3) Copeland reached out to him about placing bets with him and his partners, and he began doing so; (4) if he owed money, Copeland would tell him where to send the money, which was usually to Sauders or Ames; (5) if he was owed money, Saunders or Ames would usually FedEx cash to his Austin address; (6) he had conversations with Copeland, as well as the other defendants, about the debt he alleges he is owed; (7) Copeland personally transacted business with him for roughly one year and nine months; and (8) Copeland and the other defendants owe him $75,000.

- Copeland's affidavit stating that: (1) he became acquainted with Mayers through a mutual friend; (2) he and Mayers spoke by telephone or text message while he was in Colorado; (3) he did not know where Mayers was located "during the majority of these communications;" (4) he is not business partners with Ames or Saunders; (5) he has no owernship in www.sunwager.com; (6) he never personally met Mayers; (7) he is not a party to a contract with Mayers; (8) he never sent money to or received money from Mayers; and (9) he never traveled to Texas in connection with any transaction involving Mayers.

A far cry from the tenuous ties of an out-of-state seller contacted by a Texas buyer in *Michiana* and a nonresident friend answering the calls of her Texas-resident friend in *Old Republic*, evidence here shows that over an extended period, Copeland purposefully initiated

---

[9] Copeland contends he did not personally draft this message but instead forwarded a text to Mayers that was sent to him. Whether Copeland drafted or merely forwarded the message does not impact our analysis.

[10] *See supra* note 9.

[11] *See supra* note 9.

contact with Mayers, who he knew resided in Texas, and engaged in transactions in which at least one side of the agreement would be performed in Texas. As the trial court concluded, we agree Copeland "reach[ed] out beyond one state and create[d] continuing relationships and obligations with citizens of another state[.]" *Michiana*, 168 S.W.3d at 785 (quoting *Burger King*, 471 U.S. at 473). Accordingly, he is "subject to the jurisdiction of the latter in suits based on [his] activities." *Id.*

Copeland further argues an electronic transmission to a Texas resident cannot establish proof of purposeful availment. We disagree. While the Texas Supreme Court "recognized changes in technology have rendered telephone calls to Texas insufficient as automatic evidence of purposeful availment, the [Court] 'has not held that telephone calls are *never* sufficient to establish minimum contacts.'" *Parex Res.*, 427 S.W.3d at 427 (quoting *Glencoe Cap. Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 165 (Tex.App.—Fort Worth 2008, no pet.)). The cases Copeland cites that he claims prove otherwise are distinguishable. *See Chameli v. Fla. Gas Transmission Co. LLC*, No. 01-17-00823-CV, 2018 WL 3059732, at *5–6 (Tex.App.—Houston [1st Dist.] June 21, 2018, no pet.)(mem. op.)(no minimum contacts when in-house counsel defendant contacted plaintiff only after plaintiff sued defendant's employer and defendant's contacts with plaintiff were on behalf of his employer, not in his individual capacity); *Majors Mgmt., LLC v. Price & Co.*, No. 09-17-00063-CV, 2018 WL 771008, at *5–7 (Tex.App.—Beaumont Feb. 8, 2018, no pet.)(mem. op.)(no minimum contacts when record contained no evidence that defendants purposefully sought out business relationship with Texas-based distributor, the parties' transactions all occurred out of state, and property-manager defendant had "no involvement" in the business relationship before transferring inventory to new tenants and therefore "no control" over the fact that a debt incurred by previous tenant was owed to a Texas company); *Hatzenbuehler v. Essig*, 526 S.W.3d 657,

21

664-66 (Tex.App.—Houston [1st Dist.] 2017, no pet.)(no minimum contacts when alleged tort at issue occurred out of state and no part of contract at issue would have been performed in Texas); *Tran v. Tran*, No. 01-16-00248-CV, 2017 WL 817183, at \*5–6 (Tex.App.—Houston [1st Dist.] Mar. 2, 2017, no pet.)(mem. op.)(no minimum contacts when defendant's "availing" was to secure necessary funds to open business in Seattle, not reap profit or obtain benefit in Texas, and investment agreement contained a Washington choice-of-law clause).

*Wilson* is instructive. In *Wilson*, the Third Court of Appeals affirmed the trial court's denial of the out-of-state defendant's special appearance after agreeing that the defendant had sufficient contacts with Texas. 2011 WL 6938523, at \*5–6. The defendant argued his contacts with Texas were "too sparse" to support a purposeful-availment finding, claiming he never signed a formal agreement with the Texas attorney-plaintiffs and contacted the plaintiffs only by phone, email, mail, and fax. *Id.* at \*4. However, the court concluded that the defendant sought out the Texas plaintiffs, maintained ongoing communication with the plaintiffs regarding their fees and services (which were rendered in Texas), and paid installments to the plaintiffs. *Id.* Because the defendant "purposefully initiated contact with Texas residents intending that they would perform work in Texas" and continued his contact with the Texas attorneys during their representation, the court concluded the defendant "purposefully availed himself of the privilege of conducting activities in Texas, albeit purely through telephone conversations and written and electronic correspondence." *Id.* at \*5.

The evidence here supports a finding that, like the *Wilson* defendant, Copeland "reach[ed] out beyond one state and create[d] continuing relationships and obligations with citizens of another state[.]" *Id.* at \*3 (quoting *Moki Mac*, 221 S.W.3d at 575). He made telephone calls, sent text messages, and directed money to and from an individual he knew resided in Texas—evidence that,

22

when viewed collectively, supports a finding of purposeful availment. Despite Copeland's protests that he lacks minimum contacts with Texas because he never met Mayers in person or physically visited Texas in connection with the transactions at issue, "[j]urisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State." *Burger King*, 471 U.S. at 476.

Finally, as to whether Copeland sought some benefit, advantage, or profit by availing himself of the State, as detailed above, Copeland alleges he "was not a party to any of the alleged transactions giving rise to [Mayers'] claims;" he has never "been a business partner with defendants Skip Ames or Eugene Saunders;" he "does not currently and never has had any ownership interested in www.sunwager.com;" he "has never met Mayers" in person; he "has never requested Mayers to send him any money nor has he ever received or accepted any funds from Mayers;" he "has never entered into any agreement with Mayers to pay him money;" and his "interaction with Mayers took place exclusively from Colorado."

However, the record reflects otherwise: namely, Copeland acknowledged he received commission from Mayers' activities. On May 29, 2019, Copeland tells Mayers in response to Mayers' question about a 10% discount, "I don't get 10% until you lose more then [sic] you win. I'm not making any more money off of you. I'm just giving it back when I do get the 10%[.]" Unlike the single sale from a single Texas buyer in *Michiana*—which the Court characterized as a "dribble"—Copeland engaged in multiple transactions with Mayers over an extended period. *See Michiana*, 168 S.W.3d at 786. Indeed, as Mayers alleges, "[t]he parties exchanged hundreds of thousands of dollars" at Copeland's direction. While Copeland argues he "was not a party to any of the alleged transactions" at issue and never "received or accepted any funds from Mayers," he does not dispute the evidence that he received commission off Mayers' betting activity and

23

therefore has not negated all jurisdictional bases alleged by the plaintiff. That is enough to satisfy the "benefit, advantage, or profit" inquiry.

In sum, we agree with the trial court's conclusion that Copeland purposefully established minimum contacts with Texas.

### ii. Saunders purposefully established minimum contacts with Texas to support the exercise of specific jurisdiction.

Saunders disputes that he has minimum contacts with Texas to support jurisdiction in this case. He contends he has had no contact with Mayers "outside of Mr. Ames' use of [his] FedEx account on 4 occasions." He denies possessing any of Mayers' money, making any promises to Mayers, having any relationship with the gambling site at issue, and having any business relationship with Copeland or Ames. Saunders says the trial court should have sustained his objections to Mayers' affidavit, which contains allegations that Saunders transacted business with Mayers, owes Mayers money, should have expected to be sued in Austin, and had a business relationship with Copeland and Ames. However, Saunders argues that even accepting Mayers' allegations as true, the affidavit fails to allege minimum contacts and his contacts with Texas are at best "random, fortuitous, or attenuated"—not purposeful.

In support of his argument that he lacks minimum contacts, Saunders cites to the facts of *Old Republic*, and quotes the Court's edict that "[g]enerally, money sent to the forum state is not determinative in establishing that a defendant purposefully availed itself of Texas's jurisdiction." *Old Republic*, 549 S.W.3d at 562. Here, the record contains evidence reflecting the following:

- May 7, 2019: Copeland sent Mayers a photo of a packing slip addressed to Mayers in Austin from Saunders in Florida.

- September 25, 2019: Copeland sent Mayers a photo of a packing slip addressed to Mayers in Austin from Saunders in Florida.

24

- March 12, 2020: Mayers sent Saunders a text message stating, "Believe me when I was sending him 10-20-30k at a time he was more than responsive."

- Mayers' affidavit stating that: (1) learned Copeland was "business partners" with Saunders and Ames; (2) if he owed money, Copeland would tell him where to send the money, which was usually to Sauders or Ames; (3) if he was owed money, Saunders or Ames would usually FedEx cash to his Austin address; (4) he had conversations with Saunders, as well as the other defendants, about the debt he alleges he is owed; (5) Saunders personally transacted business with him for roughly one year and nine months; and (6) Saunders and the other defendants owe him $75,000.

- Saunders' affidavit stating that: (1) he did not enter into an agreement with Mayers; (2) he has no ownership interest in, employment relationship with, or financial connection to www.sunwager.com; (3) he is not business partners with Ames or Copeland; (4) he never promised to pay Mayers money and does not possess any of Mayers' money; (5) he is a long-time friend of Ames, who introduced him to Copeland; and (6) Ames occasionally uses his FedEx business account to send shipments.

While the record shows comparatively more frequent communications between Copeland and Mayers than Saunders and Mayers in this case, "we assess 'the quality and nature of the contacts, not the quantity.'" *TV Azteca*, 490 S.W.3d at 38 (quoting *Moncrief Oil*, 414 S.W.3d at 151). Here, as we have already determined, the evidence supports the trial court's finding that Saunders was party to a series of transactions with someone who he knew was a Texas resident. He sent money to Mayers in Texas and received Mayers' money shipped from Texas. Given the quality and nature of Saunders' contacts with Mayers, that is enough to create a substantial connection with Texas. Indeed, the Supreme Court of Texas has stated that "in some circumstances a single *contract* may meet the purposeful-availment standard" so long as it involves more than "a single *contact* taking place outside the forum state." *Michiana*, 168 S.W.3d at 786. As with Copeland, we conclude Saunders "reach[ed] out beyond one state and create[d] continuing relationships and obligations with citizens of another state[.]" *Wilson*, 2011 WL 6938523, at *3 (quoting *Moki Mac*, 221 S.W.3d at 575).

25

Lastly, Saunders contends he sought no benefit, advantage, or profit by availing himself of Texas because he was not a party to the transactions and never received any money from Mayers. That argument is unavailing. The trial court's findings of fact established that: Saunders along with the two other defendants in this case "were party to a series of transactions with Plaintiff and Austin resident Justin Mayers and the exchange of funds;" Mayers "talked and texted with . . . Saunders extensively to provide proof of deliveries and enter into numerous monetary transactions;" these arrangements "inured to Defendants' financial benefit;" and Saunders "knew that Plaintiff resided in Austin, Texas."[12] Again, because we find that the trial court's findings of fact are not "so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust[,]" we rely on those findings for jurisdictional-analysis purposes. *Fed. Corp.*, 632 S.W.3d at 716 (citing *Cain*, 709 S.W.2d at 176). And after we accept the facts above, the conclusion that Saunders purposefully availed himself of the privileges of doing business in Texas is not unreasonable. Despite Saunders' protests that Ames merely used his FedEx account as a convenience to send and receive packages, "[j]urisdiction is premised on notions of implied consent[.]" *Michiana*, 168 S.W.3d at 785 (citing *World—Wide Volkswagen*, 444 U.S. at 297). There is nothing in the record indicating Saunders even attempted to structure these transactions to purposefully avoid jurisdiction. *See Michiana*, 168 S.W.3d at 785. Saunders' argument may be more relevant at the merits stage, but it does not affect our jurisdictional inquiry.

We agree with the trial court's conclusion that Saunders purposefully established minimum contacts with Texas.

---

[12] *See supra* Section 2.a.

### b. Relatedness

Copeland and Saunders also contend the relatedness prong is not met. Copeland argues the connection between his phone calls and text messages with Mayers and the claims at issue "seem to hinge on a but-for analysis"—*i.e.*, but for Copeland's communications with Mayers, Mayers would not have sent money to or received money from Saunders or Ames. He contends the Texas Supreme Court has rejected this kind of but-for approach in jurisdictional analyses.

That is a correct statement of the law. *E.g.*, *Old Republic,* 549 S.W.3d at 561 ("We held that the but-for approach was too broad and judicially unmoored to satisfy due-process concerns" [Internal quotation marks omitted]). However, Copeland's communications with Mayers, both as alleged in Mayers' live pleading and characterized in the trial court's findings of fact, do not amount to a but-for connection to Mayers' claims. A but-for analysis "literally embraces every event that hindsight can logically identify in the causative chain." *Moki Mac*, 221 S.W.3d at 581. For example, in *Old Republic*, the Court identified a but-for analysis in the connection between the nonresident's phone calls with her Texas friend and subsequent alleged fraudulent transfers. 549 S.W.3d at 561. Here, Copeland's contacts with Texas are substantially connected to Mayers' claims: Mayers asserts equitable quasi-contract claims all stemming from money he alleges he is owed by defendants resulting from one of their many transactions. Copeland's ongoing communications with Mayers related to these transactions provide sufficient support to satisfy the relatedness inquiry.

Copeland further argues that even if we assume his communications with Mayers "could be utilized to support any of the elements required to support such claims," an electronic transmission cannot provide the basis for jurisdiction. However, that is not the applicable standard: Relatedness requires that "the suit 'arise[s] out of or relate[s] to the defendant's contacts with the

27

forum[.]"' *Luciano*, 625 S.W.3d at 8–9. "[D]ue process does not mandate a causation-only approach[.]" *Id.* at 16. Copeland's contention that his communications with Mayers "do not demonstrate why [he] would be liable for the causes of action alleged" sounds more like a merits question. "We do not resolve merits-based questions in reviewing a special appearance." *Michelin N. Am., Inc. v. De Santiago*, 584 S.W.3d 114, 134 (Tex.App.—El Paso 2018, pet. dism'd).

Saunders also contends the relatedness prong is not met. He argues that Mayers' claims do not arise from or relate to his alleged contacts with Texas, again asserting his purported lack of connection to Mayers and the ongoing transactions. However, like Copeland, Saunders' contacts with the forum—as alleged in Mayers' live petition and with any fact-issues resolved for jurisdictional purposes by the trial court—are likewise substantially connected to Mayers' claims. The fact that Saunders repeatedly and over an extended period both shipped money to Mayers in Texas and received money from Mayers provide adequate support to satisfy the relatedness inquiry.

Because this suit arises out of or relates to Appellants' contacts with Texas, the relatedness prong is satisfied.

### c. Traditional Notions of Fair Play and Substantial Justice

Finally, the exercise of jurisdiction is improper if it would offend traditional notions of fair play and substantial justice. *Kelly*, 301 S.W.3d at 659. "The defendant bears the burden of presenting a compelling case that the presence of some consideration would render the exercise of jurisdiction over it unreasonable." *Fitzgerald Truck Parts & Sales, LLC v. Advanced Freight*

28

*Dynamics, LLC*, No. 14-19-00397-CV, 2021 WL 1685353, at *10 (Tex.App.—Houston [14th Dist.] Apr. 29, 2021, pet. filed)(citing *Spir Star*, 310 S.W.3d at 879).

Copeland alleges that "Mayers' jurisdictional allegations fail to meet [the] threshold" that, among other things, "Texas' assertion of jurisdiction would not 'offend traditional notions of fair play and substantial justice.'" However, he "fail[s] to articulate the law or cite to the record, or identify any basis supporting [his] contention[,]" and he has not pointed to any evidence showing there may be a less burdensome forum with jurisdiction over this case. *Fed. Corp.*, 632 S.W.3d at 725. In any event, providing evidence that would render the exercise of specific jurisdiction unreasonable and offensive to due-process concerns is a high bar, and Copeland has not met it here; there is no evidence in the record that a more efficient forum exists with jurisdiction over this case. *See Michelin*, 584 S.W.3d at 124 n.3 ("[T]he minimum contacts analysis 'encompasses so many considerations of fairness' that '[o]nly in rare instances will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state.'" (quoting *Angelou v. African Overseas Union*, 33 S.W.3d 269, 281 (Tex.App.—Houston [14th Dist.] 2000, no pet.)).

For his part, Saunders contends exercising jurisdiction over him would offend traditional notions of fair play and substantial justice because it would be unduly burdensome for him as a Florida resident. Specifically, Saunders states that he would be burdened by having to travel to Texas for his defense in this case. He also contends he would be burdened because his co-defendant and witness Ames also resides in Florida, and if Ames fails to appear in Texas without objection to jurisdiction, Saunders will be "denied the value" of Ames' trial testimony and document production. Finally, he claims "[t]here is no apparent demonstration of this forum's convenience to Appellee and Texas being the forum for the most efficient resolution of the dispute."

However, that is not the showing required of Mayers. Once Mayers met his initial burden of pleading sufficient facts to bring Appellants within the provisions of the long-arm statute, the burden shifted to Appellants to negate "*all potential bases* for personal jurisdiction that exist in the plaintiff's pleadings." *Searcy*, 496 S.W.3d at 66 [Emphasis added]. Like Copeland's circumstances, Saunders' case is not one of the "rare instances" in which "the exercise of jurisdiction [does] not comport with fair play and substantial justice when the nonresident defendant purposefully established minimum contacts with the forum state." *Angelou*, 33 S.W.3d at 281. Exercising specific jurisdiction over Saunders in this case does not run contrary to due-process requirements.

## CONCLUSION

For the foregoing reasons, we find that Mayers' petition sufficed to allege that Appellants are subject to specific jurisdiction in Texas as it pertains to his pleaded claims. We therefore need not consider whether general jurisdiction applies, and in any event, Mayers does not allege that it does. We conclude the evidence is legally and factually sufficient to demonstrate purposeful availment, that Mayers' claims relate to Appellants' contacts with Texas, and traditional notions of fair play and substantial justice are not offended by the exercise of specific jurisdiction in this case. Accordingly, the exercise of specific jurisdiction over Appellants is permissible.

Having overruled each of Appellants' issues, we affirm the trial court's judgment.

September 21, 2022

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

30